Good morning. May it please the Court. My name is Eitan Kasteljanich, and I'm representing Joan Jager in this appeal. In March 1986, when Ms. Jager was 30 years old, she had a psychotic break and was hospitalized for 10 days and diagnosed with bipolar disorder. After her hospitalization, she did not do any work for 13 years. In 1999, she started doing some part-time work, but she's never been able to return to full-time work. In April 1997, when she was 41 years old, she first applied for Social Security Disability Benefits. Her application was denied, and she did not appeal the denial. She applied for benefits again less than a year later in January 1998. These two applications are the applications that are before you today. She is now 50 years old. To give you an idea on the timeframe we're looking at here, this has only taken nine years since her application date, but 20 years since she became disabled. I will now address the ALJ's errors, which require that this Court reverse the ALJ's decision. First and foremost, the biggest error committed by the ALJ in this case is his failure to properly consider the medical evidence from Ms. Jager's treating psychiatrist, Dr. Ely. Dr. Ely first began treating Ms. Jager when she was hospitalized for her psychotic break. Back in 1986, he continued to treat her for more than 10 years. In June 1997, in response to an inquiry from Social Security, Dr. Ely wrote a detailed letter summarizing his opinion about, well, summarizing his treatment of her and his opinion about her ability to work. Some of the most significant statements are quoted throughout my brief, but I'll repeat them here. He stated, since the onset of her illness, she has been somewhat restricted in her activities. She has never been able to return to full-time work. Though this has not been tested, my opinion is that her ability to perform in a competitive work situation is impaired. Now, under the case law in this circuit, including Smolin and Shader, this is the Dr. Ely's opinion, is the opinion of a treating specialist, a treating physician. It's entitled to the highest weight, but the ALJ gave it no weight at all. The ALJ was required to give convincing evidence that the patient's condition was unbearable. In my brief, I address every one of the ALJ's reasons, and none of them are convincing. None of them even come close to being convincing. Rather than running through those again, I'm sure you've all read the brief. That's the biggest error in this case. Now, let's be candid about it. I didn't find Dr. Ely's opinion particularly convincing. So I, although I will allow you to read the brief, I will allow that I'm not sure that everything the ALJ said was correct. I don't know that we can take as a given that Dr. Ely's opinion is so powerful that it by itself controls the result of this case. I'm just letting you know that I did read your brief, and I understand the reasons given by you as to why the reasons given by the ALJ should not be persuasive. But I'm not bowled over. Okay. Well, let me then explain. Let me turn this convincing issue around. Dr. Ely wrote a letter, and it's got some statements in it. And it describes basically his summary. He's been, he was a treating psychiatrist for more than ten years. That's a rare situation these days. The only reason he stopped treating her was because her insurance no longer covered it. She, at that point, had to switch over to the, a different clinic where she was being treated by an ARNP and a person with an MS, these other people that I'll discuss in a moment. But the ALJ could not reject Dr. Ely's opinion unless he stated convincing reasons for doing so. None of the ALJ's reasons are convincing. Now, even if, assuming arguendo that you don't find that Dr. Ely's opinion standing by itself proves that she is disabled, the fact remains that because the ALJ did not state any convincing reason for rejecting Dr. Ely's uncontradicted medical opinion, we must credit that opinion as true and then move on. Could you go through those reasons and you could explain why you think they're not convincing? I think he has five reasons. Okay. I'll be happy to. First of all, he describes the, Dr. Ely's opinion as being speculative and equivocal. Dr. Ely's opinion is that Dr. Ely had 10 years of treating her. This is not speculation. This is not somebody who treated her one time. Well, he's the one that uses the words, though this has not been tested, before he gives his opinion with regard to her ability to work. Right. So it's not based on any empirical evidence. But nobody ever has empirical evidence if somebody hasn't been working, right? No doctor does. That's true. And that seems to be an accurate statement of the fact that if she can't work, you're not going to be able to test it by going to work. All he said was that she hadn't been to work and therefore it was his professional medical opinion. Why is that speculative? Well, in my opinion, it's not speculative. I suppose any doctor's opinion is speculative. He gives an opinion about what he thinks is wrong with you. It's based on his best guess, his best professional opinion after 10 years of ongoing treatment and medication management. That his best guess was, hasn't been tested yet, but I don't think she can work. I don't think she can handle competitive employment. Understand, this is also based on the fact, while she was going to him, she attended college. But she had a lot of trouble doing that. She had incomplete, it caused problems doing that for her. It took her a longer period of time. He'd seen her. He'd helped her through all that. And he cites that in his report as well. So the first reason was this speculative and equivocal comment. The second reason was that it was not supported by contemporaneous notes or observations. Dr. Ely's notes weren't originally requested by Social Security. And I think by the time anyone asked for them, this was, he didn't have them. What he had basically was, he'd taken all of his notes because he was no longer treating her. He'd written a treatment summary, and he passed it on to the new treatment providers. And that's what we have. But we do have him saying, this is my summary of my treatment for 10 years. In that case, are they obligated to go back and give him an opportunity to come up with his original notes? Or does he not have them because he's passed on? We're now into a 20-year thing. This is 10 years of it, right? I don't think he still had them. I think he basically took them and made a complete summary of them for use of the next treatment provider. And so certainly we're not 20 years down the road from when he started, and 10 years down the road, 9 years down the road from when he stopped treating her. There's no dispute that he was treating her during this time. There's no dispute of that. Another reason cited by the ALJ is that Ms. Jager was stable. And the fact that he said she was stable means she's not disabled, presumably. Well, there's lots of people out there who are stable, but who can't work. Stable in a mental health context can be viewed, and I believe it was being viewed by Dr. Ely here, as showing that she hadn't decompensated. He had successfully helped her to where she didn't end up back in the hospital. And he also discusses in this report, part of how she managed to keep out of the hospital was by carefully circumscribing her activities. Carefully controlling them so she didn't do things that would cause her to lose control, because she was terrified of ending up back in the hospital. The ALJ also said that Dr. Ely has no expertise in vocational issues and is not qualified to speculate on this. Well, first of all, it's not speculation. Well, the district court set that one aside. The district court shot that one down itself, so I don't think you have to worry about that one. And then the last reason is that Dr. Ely annotates accomplishments which would appear inconsistent with his conclusion. Once again, here the ALJ, while noting that she'd gone to college, didn't consider Dr. Ely's comments about the problems she had doing that. How she needed extra help, she took extra time. It was not a question of whether or not she was capable of that. It was not like she just was doing it gung-ho with no problems at all. She had a lot of problems getting through it, but she wanted to find some way to get additional training so maybe she could work. And the fact is, because she went to college, she was able to get part-time work, which she continues to do to this day. She just can't handle the stress of anything more than that. Those are the reasons. None of them were convincing. Now, Dr. Ely's opinion covers up through really up past the date last insured in this case, which is quite distant. But as far as to prove ongoing disability, you need current treatment as well to consider that information. Her current treatment is Dr. Bobby Fletcher and MSW, Emily Scheinfelder. And both of them opined that Ms. Jager could not handle the stress of full-time work. And they described where she would have periods of stability. She'd do pretty well. Then she'd have episodes of acute, I'm quoting now from one of them, episodes of acute decompensation when she was unable to work or even care very effectively for herself. During these episodes, Joan has severe inability to concentrate and is unable to perform consistent tasks, even doing the dishes daily. During her depressive episodes, she experiences severe anhedonia, sleep disturbance, primarily in the form of excessive sleep, up to 15 hours a day, decrease in energy, feelings of worthlessness and difficulty thinking and concentration. And this is on all of her meds, being stable. These are the problems she continues to have. Periodically. The ALJ rejected the opinions of these treatment providers, even though that's, in this day and age, most people with mental illness can't see a psychiatrist or a psychologist. All they can get treatment from is a person who's got ARNP at the end of their name, a nurse practitioner. That's who's treating her. That's their opinion. The ALJ gave reasons that aren't germane for rejecting their opinions. By saying So I want to make sure I know, was that, I've got a list of the various providers, and which one was that? That's Ms. Fletcher and Ms. Scheinfelder. Thank you. Bobby Fletcher, Emily Scheinfelder. The ALJ rejected their opinions because they were more recent, but that's not a reason to reject opinions about current functioning. The ALJ also rejected all of her testimony. He was required to state convincing reasons for doing so. In my brief, I run through every single reason stated by the ALJ, not a single one of them that's a convincing reason. Just to be more precise, was that step two that we have Dr. Ely's opinion? Is that right? Well, I didn't know how to organize that, quite honestly, because there's a problem here. The ALJ wrote his decision with a bunch of alternative findings. So he started off by saying no severe mental impairment. Well, what disproves that is the medical evidence from Dr. Ely. That shows that indeed she had a problem starting in 86, it continued for the entire 11 years he treated her, and in his opinion, throughout that time prevented her from working. That sounds like a severe impairment. So that gets you past step two. As far as step three, there's another error by the ALJ at step three. The case was remanded by the appeals council after the ALJ dismissed it the first time it came before him. It was remanded specifically so that he could consider her case pursuant to the new mental health listings. Came back to him, he didn't even mention listing 12.04C, which is right on point. Doesn't even mention it in his decision. So that's the step three issue, is the ALJ should have found her disabled at step three, based on her meeting, 12.04C, based on the uncontradicted medical evidence that shows that she can't handle that slight, that an increase in stress would cause her, would predictably cause her to decompensate. The ALJ didn't consider her testimony, the ALJ didn't consider the lay testimony properly, gave reasons that were not even, that were made up. They didn't comport to the facts. The ALJ came up with an RFC assessment that wasn't supported by substantial evidence, because he didn't consider what Dr. Ely said, what Dr. Ely said, or what Ms. Scheinfeld or Ms. Fletcher said. He didn't consider any of her testimony. He didn't consider any of the lay evidence. So of course his RFC doesn't, there's no substantial evidence supporting it. Finally, at step five, the ALJ, in his alternative findings, found, at step four he found she couldn't do her past work, but at step five he used the grids. This is an individual with serious non-exertional limitations arising from her mental illness, and even the state agency doctors, in one of their reports, Dr. Harris, Lance Harris, cited that she had moderate limitations in significant areas. The ALJ ignored that. The ALJ ignored the limitations from Dr. Ely, Ms. Scheinfeld, or Ms. Fletcher, and basically just said, I'm just going to follow the grids, and under the grids, she can work. Well, that's, that's legal error in this circuit. Tack-it-the-apple does require that when you've got serious non-exertional limitations, you've got to take testimony from a vocational expert. Well, final legal issue, legal problem here involves the ALJ not discussing reopening the previous application. Under social security regulations, because the new application was made less than a year prior to the, receiving the denial on the original application, the new application can be reopened for any reason at all, and as a matter of course, those are reopened. The ALJ didn't reopen it, didn't explain why he wasn't reopening it, just didn't mention it. What's the practical difference? Well, the practical difference is, if it's found, if the earlier application is reopened, then, and she is found to be disabled, then she would be eligible for benefits based on that application date, which means she could get benefits as much as one year, she would get them one year prior to the application date. And if it's not reopened, then she would lose out on the eight months of benefits between those applications. We're talking about eight months difference in benefits. That's right. Okay. Do you want to save time for rebuttal? Yes, I would. Thank you. Good morning, Your Honors. David Johnson, representing the Commissioner of Social Security, Joanne Barnhart. In 1986, March, there was an acute onset with Ms. Jager's bipolar disorder. She was hospitalized. She was treated by Dr. Ely. Since then, she's cared for up to three boys at one time. She's maintained a household with a husband who's disabled with a spinal injury. She's finished college with a 3.8 grade point average. She's undertaken major home projects, wallpapering, painting, and she currently teaches citizenship to individuals. Dr. Ely's opinion gives both medical and vocational opinions, and the ALS community is a very diverse community. The ALJ properly utilized, or in judging the evidence as a whole, made use of the medical opinions more than the vocational ones. Dr. Ely stated that Ms. Jager, when on medication, was essentially free of significant abnormalities. And that supports a finding in Step 2 that there's no severe impairment. Let's take a look at Step 2, because under our case law, Step 2 is not much of a step. Specifically, let's go to the web case from last year, which I guess is the most recent that I'm conscious of. Describes Step 2 as a de minimis screening device used to dispose of groundless claims. And you can lose on Step 2 only if the ALJ's finding is clearly established by medical evidence. Now, I may agree with you that, as I've already expressed, I don't think this is the most powerful case I've ever seen. But looking to how low Step 2 is, can you really say that this is a claim with only a slight impairment, or this is a de minimis claim? I mean, there is Dr. Ely's opinion, which the ALJ has to set aside to get to the result that he does. Doesn't that establish, together with even Dr. Harris's observation, something more than a slight impairment? Well, it is a de minimis standard, and it is no, no, it does not establish more than a slight impairment. It is a de minimis standard, but it is a standard nonetheless, and it's not just Dr. Ely's opinion, and not all of Dr. Ely's opinion conflicts with the ALJ's finding of Step 2. Essentially free of significant abnormalities, Dr. Harris and Dr. Goldberg reviewed the entire record as it sat before them. They're experts in the disability litigation process, and Tonopet Chin tells us that their opinions can be substantial evidence. They and the ALJ gave good reasons for giving weight, more weight, to Dr. Goldberg than Dr. Harris. Interestingly, in the alternative findings, he did adopt one of Dr. Harris's limitations, the limitation on dealing with members of the general public, which is something that Ms. Jager currently does in her activities. She's a member of the board of directors of the University of Teaching Citizenship. So it's the entire body of evidence that must be looked at, and true, it is a low standard, but in this case, because we have other physicians who are opining, and Dr. Ely opining, that she's essentially free of significant abnormalities, the medicated condition is what is considered under 404-1529C3, and she, it is not a severe impairment. In case the court finds that... Well, aren't we taking Dr. Ely's statement that she's essentially free of significant abnormalities out of the context of that paragraph? He says that when she's on the medication, and she's essentially free, but he goes on in the next couple of sentences to say, but she has mood allergies. And then she's not. It's not as if it's only that she's free. She's free as long as everything's working, and her mood's not elevated. But when she has the mood elevations, which she has, he says, then she's impaired. Well, he does say she has mood elevations. He also notes her activities, including caring for three children, and the lay witness, Teresa William, told us that she supervised the kids very well, and didn't have differences that anyone else, normal person without an impairment, doesn't have with the children. So in the medical world, Dr. Ely's reporting from a medical frame of reference. The ALJ and Dr. Harris and Dr. Goldberg are analyzing the evidence from the Social Security regulations point of view, and Dr. Harris and Goldberg add to the regulations the medical knowledge that they come with. So yes, Dr. Ely does say many things, and if the court were to order it credited as true, we wouldn't know what to do with that result, because he says different things at different times when they're viewed in the context of the Social Security regulations. I guess in terms of what to do with the result, you get past two for sure, correct? I would disagree, because you credit as true that she is essentially free of significant abnormalities. Except when she has the mood elevations, which she has periodically. But mood elevations don't necessarily mean that it's more than minimal. Mood elevations can be when I am nervous standing here. But he gets to the conclusion, he states the opinion, she can't work. So I have some trouble taking out the first sentence of the paragraph, unless you pay some attention to the last sentence of the paragraph too. Again, I may not be particularly persuaded by Dr. Ely's opinion, but I think it's very difficult to cite that opinion as support for the proposition that she doesn't have a problem. So that's why I think step two, as Judge McEwen suggested, is really a hard place to stop. I understand. So then if you get to step three, what do you say about the statement made that didn't really, well, I think it was a statement. Well, the statement made here. The 1204C criteria were not actually invoked. That's incorrect. Excerpts of records, page 32, the AOJ specifically discussed 1204C. And there is no evidence in the record that a minimal increase. I'm sorry. Please go to that page again. 32. Yeah, 32. There is no evidence in the record that a minimal increase in the mental demands would cause decompensation. I would submit that caring for three boys would cause more than a minimal increase in mental demands, and there's no evidence that she decompensated after her hospitalization. Remember, the decompensation is more than just having a bad day or having difficulty. A mood elevation might be having difficulty at a moment, but the decompensation is an entirely different standard. So step three was discussed by the AOJ. There's no evidence in the record that it's been met. And, in fact, at excerpts of records 300, there's the evidence that the Social Security Administration requested more than just a letter from Dr. Ely, and we did so in 1997. We asked for all of his treatment records from 1986 forward, and he provided us with what he'd provide us with. And that is all we have to go on. And that is also a reasonable under the regulations, the AOJ made every reasonable effort to develop the record. Mays, of course, tells us you only need to develop the record when it's vague or ambiguous. In this case, a request to the doctor and his response isn't vague or ambiguous. It's what he's willing to provide, and the regulations say that's sufficient. I guess the question would be, too, if he should have properly ‑‑ these are always hypothetical, but if he should have properly credited Dr. Ely's testimony, then that would have potentially changed the calculus under Step 3. No, because Dr. Ely didn't say, as has been referenced here in oral argument, that she was unable to work. The actual language is that her ability to work was impaired, not that it was precluded. And Step 3, as well as the residual functional capacity finding, which would come if there's a negative Step 3 finding, deal with what are your work‑related limitations and what can you still do despite those limitations. So Dr. Ely's statement that there would be mood elevations doesn't indicate decompensation, which Step 3 requires. Step 3 is you are so in such a spot that there's no question that you could do no job. You are per se disabled. So that's why the standard is decompensation caused by even a minimal increase in mental demands, not merely a mood elevation caused by a minimal increase in mental demands. Additionally, if you go on then to Step 5, the residual functional capacity finding was appropriate and the application of the medical vocational guidelines was appropriate in that, as the ALJ noted, Social Security Ruling 8515 says that unskilled work deals with things, not people. The medical vocational guidelines deal with only unskilled work. The limitation in her residual functional capacity was that she couldn't work with the general public. Thus, the jobs considered by the medical vocational guidelines aren't part of the jobs that she was limited from. I would like to point out that Webb is distinguishable, going back to Step 2, in that in Webb, as Your Honor stated, there was no medical evidence of non-severity. Here, Dr. Ely's statement, Dr. Harris's opinion, and Dr. Goldberg's opinion are all medical evidence of non-severity. Additionally, in Webb, treatment hurt the Webb situation. It increases hypertension or, I'm sorry, the treatment for the hypertension caused side effects. In this case, Dr. Ely has told us that the treatment has made her essentially free of significant abnormalities. I wasn't trying to cite to Webb because of the factual, and you understand that, but I should make it clear is you are again citing Dr. Ely's opinion as affirmative evidence. I just want you to know I have some real trouble with that. Again, I may be prepared to discount it in various ways and indicate that I think it is in some ways self-contradictory, but I have difficulty taking out of it an affirmative statement that there's a lack of severe impairment. I think it is ambiguous at best, which is one of its problems as I try to put it to the applicant's case, but I don't know if it can be fairly cited, and I don't think the ALJ really affirmatively leaned on that as a reason to support the conclusion, although his discussion arguably could be read that way. True, he looked at Harrison, Dr. Harrison. I think he leaned on the others, which raises the issue of what you have to go through and the arguments really made by the applicant about what you have to go through to discount the treating physician in favor of non-treating physicians. I'm just saying as I read it, I don't see much affirmative support from the treating physician's opinion to a conclusion that there's a non-severe impairment. If you got to Stage 5 or Step 5 because we disagreed with you, would you respond to counsel's argument that because of the nature of the psychiatric impairment that you would need a vocational expert here and that you couldn't just rely on the grids? Certainly. As I stated, the medical vocational guidelines account for the unskilled world of work, and they rate with a certain amount of age, recency of education, that sort of thing, whether or not you could do the unskilled work that exists in the world, in the United States, given your exertional level, sedentary, light, medium. Social Security ruling 8515 states that you can use the medical vocational guidelines in some instances where there are non-exertional impairments, even though the medical vocational guidelines don't necessarily account for non-exertional impairments. And the way that link is drawn is that they only include unskilled work. Unskilled work, 8515 tells us, deals with things primarily, not people. The ALJ said in this case the only limitation evidenced by the medical evidence prior to or date last insured that wasn't attenuated by medication was a limitation by Dr. Harris on dealing with the general public. So that's not going to exist in the general world of unskilled work. So there's no non-exertional limitation that's not already, that precludes the application of the medical vocational guidelines. What do we do, I mean, I don't know what to do with, I hear what you're saying and the ruling. Then we have this case that says where the impairment is psychiatric rather than physical, relies solely on the guidelines, is clear legal error, this Holohan case. So I'm not quite sure. I'm not sure that Holohan considered this precise situation. And you're saying the precise situation is the unskilled work that puts you in kind of a different category. Unskilled would not require you to work with people as much as things. And so there's a significant number of those jobs you can do. But all of this, of course, is dependent on the fact that you reject Dr. Ely's and the lay witness's testimony. And he's relying on Dr. Harris's. That's it. You're saying that if that's correct, then what he did on Step 5 was proper. But you wouldn't say that Step 5 was satisfied if you accepted Dr. Ely's testimony and the other testimony that supports the applicant's claim. I'm saying that if you accepted Dr. Ely's testimony, it wouldn't provide more than a scintilla of evidence, substantial evidence, to justify changing the residual functional capacity finding, in that because Dr. Ely. That's under your reading. If you accepted, let's say, the plaintiff's reading of Dr. or the appellant's reading of Dr. Ely's testimony and the reading of the other testimony that supports their case, then we wouldn't come to the same conclusion under Step 5. I'm not sure the plaintiff has represented Dr. Ely's opinion correctly. As I stated, he said the ability to work was impaired. He didn't necessarily state how it was impaired, other than talking about her avoiding stress. And I would submit that that's contradicted by plaintiff's own statements that she cared for three boys at a time. That's going to produce stress. Even if you try. Well, if she said it wasn't stressful, then she couldn't have done it with other children. Actually, she did say, yes, that she couldn't have done it with children she didn't know. But she also testified at Excerpts of Record, page 50, that having the responsibility of the children helped her. It made her take her medication. It made her cook her meals. It made her follow the schedule. In other words, having the structure, having people depending on her, similar to having job responsibilities, improved her situation. It's hard to absolutely translate and say taking care of relative-related children and having that structure is the same as having a structure where you have to show up at an outside job. I'm not sure you can make that link. I agree. I agree. And I'm not saying because she did that she could do a job. I'm wondering whether, I guess procedurally, if we were to disagree with you and we got to step five and then Dr. Ely's testimony would be credited, would this be a case that should be remanded then rather than being decided on the record here? Well, I would submit, of course, the crediting as true doctrine is optional, as it has been applied in some cases by the Ninth Circuit and has not in others. If you did remand it or an order, or even if this Court were to itself credit as true, I'm not sure that you could discern what the result would be because you're crediting statements which contradict with themselves and with other evidence in the record which we agree is true. So you'd have to have an ALJ run it through and affect all the other evidence. Well, and if this Court sent it to an ALJ to say credit Dr. Ely is true, the ALJ would face the same problem. She says she can care for up to three boys at a time. Dr. Ely says she can do that. Both of those are true. And yet she needs to avoid stress. Even though they're relatives' children, children are demanding. Children cause stress. And that is something that she has been able to deal with. So we could probably take another 10 years with this case because we could send it back and then we'd have that argument. I can hear the argument you're making. And then you might find an ALJ who would agree with that. And then we'd come back up to the district court, back up here again, and it'll be 2016 for this. If I could address that, Your Honor, I agree. It's been a long time. But we need to look at why. On January 30th of 1998, she filed the current applications. It was denied by an ALJ. That means it had gone through an initial and possibly a reconsideration within one year, January 16th of 1999. Then there was a delay until September 14th of 2001 when the Appeals Council finally remanded it. That delay was in her favor because the Appeals Council told the ALJ to now apply a September of 2000 listings change, a change at Step 3 that had occurred in the meantime, even though the denial had nothing to do with Step 3 and it relied on a Step 2 finding. If we delay it another 10 years, she may get another favorable change in her file. The regulations may change in favor. Okay. I don't know. The key is that more than a scintilla of evidence supports the commissioner's decision, and it's not for this court to try it de novo. This decision has not come about lightly. Judge Layton responded to 19 pages of objections. Judge Strombaum issued a thorough 22-page decision, and the ALJ issued a 22-page decision, and it's been thoroughly looked over. More than a scintilla of evidence supports the ALJ's decision. Thank you, counsel. Thank you, Your Honor. With all due respect to Judge Strombaum and Judge Layton, I believe they erred in their consideration of this case. And as you know, the standard of review here is de novo. We're looking at the ALJ's decision, not their decisions. What do you have to say about the Step 3 and your statement that they didn't consider the grids and the – when you look at the decision? Let me – allow me to correct myself. Yes. I stated – I misstated. And more accurately, the problem at Step 3 is that he did mention it. He ran through it. He listed – described what 12.04c requires. The problem is, because he had rejected all of the evidence that could support a finding at Step 3, of course he had to conclude that there was – that she didn't meet the listing at Step 3. He rejected in its entirety Dr. Eli's opinion. I guess he probably accepted the one first sentence. Rejected all – anything that showed that she couldn't work, he rejected all of that. He rejected everything from every other treatment provider. He rejected all of her testimony. He rejected all of the lay evidence. If you reject all of the evidence supporting her claim, you can only conclude that she doesn't meet a listing at Step 3. So he did mention it, but his consideration was tainted by the fact that he rejected all the evidence supporting her case. When did you get to Step 5? What if we agreed with you on that? You got to Step 5, and then Ms. Johnson says, well, there, you look at the ruling 8515, it really – this is an unskilled work situation that you can, you know, look to the grid in this occasion. And even if you credit her physician, he simply says she's impaired, not that she can't work. Okay. I responded to this at page 23 in my reply brief, citing directly from that ruling, 8515. Social Security ruling 8515 has additional language that states things like, the reaction to the demands of work, stress, is highly individualized. Mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called low-stress jobs. Ignore this whole entire section of 8515. Social Security ruling 8515 actually supports her claim. So – Do you think she, in light of that, one of the arguments made is that there should have been a vocational expert to try to put all this together? If this case goes back for another hearing, which I don't think it should, if it does go back for another hearing, yes, there would have to be a vocational expert. Why do you think it shouldn't go back? Because if you credit as true Dr. Ely's opinion in its entirety, even the good sentence at the beginning, if you look at the whole picture from Dr. Ely, if you look at all of Ms. Jager's testimony about, yes, she could babysit her nephews, the problems she had being in school, et cetera, if you look at all of Ely's testimony, if you look at the information from Ms. Scheinfelder and Ms. Fletcher about her current ongoing or additional more recent medical treatment, credit all that as true. I don't see how you find out a job that she can do. And even the – Let me stop there. I mean, I guess the difficulty I have with that is that even if we were to agree with you on Dr. Ely, the way you've now framed it, we would have to, like, throw out the complete rest of the ALJ's opinion on the crediting – its discrediting these other people. So you're saying everything would have to be credited as true. The ALJ made so many errors that he discredited every single piece of evidence that supported her claim, and he didn't give – He didn't reject and discredit it because he's not persuaded by something. Those are different things. And I think by putting them together the way you have, you make it difficult for us, for me at least, to take them apart again. You're painting with a very broad brush, and that may not be the right brush to use. Okay. Can I just say one final comment about Dr. Harris? Dr. Harris's opinion, which is at page 51 in my brief, he actually mentioned – and he's the state agency doctor. He mentioned a bunch of moderate mental functional limitations that should have been included in the RFC, and they would require that there be a VE at step five. That's their own position. It's at – you can see it in my brief, the page 51, that has the reference to the citation in the transcript. Thank you. Thank you both very much. The case, as argued, will be submitted. The Court will stand in recess for the hearing.
judges: Reinhardt, McKeown, Clifton